# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2019-0442, <u>State of New Hampshire v. Blake Colella</u>, the court on April 16, 2021, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. Following a jury trial in Superior Court (<u>Colburn</u>, J.), the defendant, Blake Colella, was convicted of witness tampering, <u>see</u> RSA 641:5, I(b) (2016), and was acquitted of first degree assault, second degree assault, criminal threatening, and on two counts of cruelty to animals, <u>see</u> RSA 631:1 (2016) (amended 2017); RSA 631:2 (2016) (amended 2017); RSA 631:4 (2016); RSA 644:8 (2016) (amended 2018, 2019).[1] He appeals, arguing that the trial court erred in admitting evidence of an alleged incident in Fall River, Massachusetts, ("Fall River conduct"). The State counters that the trial court did not err in admitting this evidence and, alternatively, that any error was harmless. We affirm.

I

The following facts and procedural history are taken from the record of the hearing on the State's motion <u>in</u> <u>limine</u> or from trial. The defendant's first and second degree assault, criminal threatening, and cruelty to animals charges stemmed from his alleged conduct occurring on or about April 22, 2017. The witness tampering charge resulted from his conduct on August 16, 2018. In June 2019, the defendant went to trial on all of his charges. Evidence of the Fall River conduct, allegedly occurring on April 19, 2017, was admitted at trial.

Prior to trial, the court addressed the admissibility of the Fall River conduct evidence in response to the State's motion <u>in</u> <u>limine</u>. The court ruled, over the defendant's objection, that this evidence was intrinsic to the charged conduct occurring on or about April 22, 2017, <u>i.e.</u>, to the alleged conduct underlying the first and second degree assault, criminal threatening, and cruelty to animals charges. It also ruled in the alternative that the Fall River conduct was admissible under New Hampshire Rule of Evidence 404(b), "for largely the same reasons" cited in its intrinsic evidence ruling, but also to "understand why [the victim] would not have simply run away from [the] defendant, [because] evidence of . . . the prior assaults committed upon [the

---

[1] The defendant was also acquitted of the domestic-violence variants of first degree assault, second degree assault, and criminal threatening. <u>See</u> RSA 631:1, :2, :4.

victim] by [the] defendant, would indeed [be] quite relevant.  Viewed in this light, the evidence tend[s] to prove, not necessarily [the] defendant's state of mind but rather [the victim's]."  (Quotation omitted.)

At trial, the following evidence was presented to the jury.  On April 19, 2017, the victim drove to Plymouth, Massachusetts, picked up the defendant, her then husband, and drove him to Fall River, where the Fall River conduct allegedly occurred.  According to the victim's testimony: The defendant took the victim's cell phone and began searching it, telling her that he wanted to find out if she had been cheating on him.  After finding a male co-worker's name in the victim's phone, the defendant accused her of cheating.  The victim attempted to explain that she did not cheat on the defendant, but the defendant became "irate" and punched her in the arm so hard that her head bounced off the driver's-side window.  She continued to drive, and the defendant continued to scream at her.  The victim eventually pulled the car over, at which point the defendant punched her in the face three times.  The defendant then grabbed the victim by the throat, pushed her into the backseat, and told her to get down so that no one would see her because her face was bleeding.  While confining the victim to the backseat of the car, the defendant kept her cell phone, and he drove to her apartment in Nashua.  The victim testified that she did not leave her apartment that night or call the police because she was afraid of the defendant, and he told her that if she called the police, he was going to kill her.

On or about April 22, 2017, the defendant allegedly engaged in conduct that resulted in the first and second degree assault, criminal threatening, and cruelty to animals charges being brought against him in New Hampshire.  According to the victim's testimony: That day, the defendant and the victim went out to dinner and went shopping, where the defendant applied for a store credit card.  His application was denied, and he blamed the victim.  After returning to her apartment, the defendant told the victim to sit down in the kitchen and not to move.  He repositioned his watch so its face was on top of his knuckles and told the victim that he was "going to cave [her] face in for ruining his credit, [and] ruining his life."  When the victim's cat walked into the kitchen, the defendant told the victim that he was either going to "break [her] cat's neck and make [her] bury him," or "brand [her] for what [she was]."  The victim pleaded with the defendant not to hurt her cat, but the defendant kicked the cat, which "flew through the air" and "skidded into the living room."  Next, the defendant grabbed the victim by the throat and choked her.  He then told her to stand up and take off her shirt.  The defendant began carving letters into her back with a kitchen knife, then pointed the knife at her and said, "if I stab you . . . you'll die in five minutes."  The incident stopped when the victim begged the defendant to kill her.  Neither she nor the defendant left the apartment that night.

The next day, April 23, the defendant left in the victim's car, and she called the police "several hours" later. She was interviewed by the police, and the defendant was subsequently arrested and was charged with first and second degree assault, criminal threatening, and cruelty to animals. The victim's call to the police on April 23 was the first time she reported the alleged incident on April 22 and also the first time she reported the alleged Fall River conduct on April 19. The victim was confronted on cross-examination with her delay in reporting, and she testified that she was afraid of the defendant and what would happen if he knew she had called the police. As related to the Fall River conduct, the jury heard that the charges brought by the Commonwealth of Massachusetts were later dropped, apparently due to the victim's lack of cooperation. She testified that, in that case, she "claimed spousal privilege out of fear and intimidation."

Evidence was also adduced that the victim sent two letters to the New Hampshire prosecutors, one in June 2018 and one on August 10, 2018, both explaining that she did not want to participate in the case against the defendant, that she was writing the letters of her own accord, and that her reasons for writing the letters were "private." However, the victim testified that she wrote these letters because she was afraid that the defendant would hurt her, or have "certain third parties" hurt her, if she testified against him, and also that the defendant told her to write the letters.

On August 16, 2018, the defendant engaged the victim in a text message exchange, which formed the basis for his witness tampering charge. The exchange read:

Defendant: "My lawyer is going to eat you alive. Everything will come out."

Victim: "Such as?"

Defendant: "Every sick secret you have in front of the jury."

Victim: "Okay, whatever those are."

Defendant: "And I will have recorded everything."

Victim: "My questioning you as my spouse, okay."

Defendant: "You forgot everything I know."

Victim: "Apparently I h[a]ve."

Defendant: "And he's getting all your records, every jail you've been to."

3

The victim testified that she understood these messages to mean that the defendant was telling her not to testify, and if she did, then the things referenced would occur. The victim denied that she responded, "Absolutely not," when the defendant's mother sent a text message to her saying, "And he's definitely not tampering with you."

Before the Fall River conduct was admitted at trial through the victim's testimony, the defendant noted his pretrial objection again. No limiting instruction was requested at that time, but the State inquired as to an instruction during trial later that day. The parties agreed to the trial court's proposed limiting instruction and agreed that the court would instruct the jury after the prosecutor completed his direct examination of the victim and before the defendant began his cross-examination. The jury was then instructed:

> Evidence has been introduced that the Defendant is alleged to have engaged in other crimes, wrongs, or acts associated with assaulting [the victim] on April 19th, 2017, in Fall River, Massachusetts. You may not consider this as evidence of the Defendant's character or to conclude that he acted in conformity therewith on April 22nd, 2017. Rather, you may only consider this evidence for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Keep in mind that the Defendant is not on trial for the events that allegedly occurred in Fall River, Massachusetts. It is your duty to decide whether the State has proven beyond a reasonable doubt that the Defendant committed the particular crimes charge[d] on April 22nd, 2017 and August 16, 2018, only.

When instructing the jury after closing arguments, the trial court delivered the same instruction, with, as emphasized, one addition: "Rather, you may only consider this evidence for other purposes, such as, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or delay in reporting by the alleged victim." (Emphasis added.) The defendant had objected to the addition of this language, as proposed by the trial court, because "it's not part of the standard instruction and may highlight too much coming from the Court as an instruction to — that [the jury] should find it," and due to his standing pretrial objection to the admissibility of the Fall River conduct.

The case was submitted to the jury, and it found the defendant not guilty of the first and second degree assault charges, the criminal threatening charges, and the cruelty to animals charges. The jury found him guilty of witness tampering. See RSA 641:5, I(b). This appeal followed.

4

II

On appeal, the defendant makes several arguments that the admission of evidence of the Fall River conduct was error. We review the trial court's ruling on the admissibility of evidence for an unsustainable exercise of discretion, and will reverse only if it was clearly untenable or unreasonable to the prejudice of the defendant's case. State v. Papillon, 173 N.H. 13, 24 (2020). However, we need not decide whether the trial court erred in admitting the Fall River conduct because we agree with the State that any error in admitting this evidence was harmless beyond a reasonable doubt.

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

Id. at 28 (quotation omitted). To establish that an error was harmless, the State must prove beyond a reasonable doubt that the error did not affect the verdict. Id. This standard applies to both the erroneous admission and exclusion of evidence. Id. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight and if the improperly admitted evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. Id. at 28-29. In making this determination, we consider the alternative evidence presented at trial as well as the character of the erroneously admitted evidence itself. Id. at 29.

Any error in admitting the Fall River conduct was harmless beyond a reasonable doubt with respect to the defendant's witness tampering conviction. To convict the defendant of witness tampering as charged, the State was required to prove that on or about August 16, 2018, he, believing that an official proceeding as defined in RSA 641:1, II was pending, purposely attempted to induce or otherwise cause the victim to withhold her testimony by sending her text messages stating, "my lawyer is going to eat you alive," "everything will come out," "every sick secret you have in front of a jury," "I will have recorded everything," and "I know everything about you," while indictments were pending against him for assaulting her. See RSA 641:5, I(b); see also RSA 641:1, II (2016) (defining "official proceeding"). See generally RSA 641:5, I(b) (a person is guilty of witness tampering if, "[b]elieving that an official proceeding . . . or investigation is pending or about to be instituted, he attempts to induce or otherwise cause a person to . . . [w]ithhold any testimony, information, document or thing"); State v. Moscone, 161 N.H. 355, 359 (2011) (explaining that in State v. Kilgus, 125 N.H. 739, 743 (1984), "[w]e concluded, without analysis, that the trial court used the proper mens rea

5

when it instructed the jury that 'the defendant had to act purposely when he attempted to get a person to give the police false information.' Since Kilgus, we have required a purposeful mental state for witness tampering convictions." (brackets and citation omitted)).

The evidence of the defendant's guilt on the witness tampering charge was overwhelming. The text message exchange on August 16, 2018, was presented to the jury as an exhibit and discussed at length in the victim's testimony. Those text messages from the defendant included, "My lawyer is going to eat you alive. Everything will come out," and "Every sick secret you have in front of the jury." The jury heard that the victim understood those text messages to mean "[t]hat [she] was being told not to testify and this is what would happen, this would be the outcome should [she] go and testify." The jury also heard that earlier in August 2018, and in June 2018, the victim sent letters to the prosecutors "regarding [her] intention not to testify against [her] husband," saying she did not want to participate in the case against him, and that her reasons for not wanting to do so were "private." The victim testified that the defendant told her to write those letters and that she was afraid of what would happen if she testified against him, including that "certain third parties had been instructed" to deal with her accordingly. See State v. Castine, 172 N.H. 562, 565 (2019) ("The evaluation of witness credibility and the weight given to witnesses' testimony are issues for the jury to resolve." (brackets and quotation omitted)).

Against this evidence of the defendant's guilt, the admission of the Fall River conduct was cumulative and inconsequential. See State v. Edic, 169 N.H. 580, 590 (2017). To the extent the defendant argues that the Fall River conduct was prejudicial because of its similarity to the charged conduct, any similarity between the Fall River conduct and the conduct underlying the defendant's witness tampering charge pales in comparison to the similarity between the Fall River conduct and the conduct underlying the first and second degree assault, criminal threatening, and cruelty to animals charges, of which the defendant was acquitted. Cf. State v. Cossette, 151 N.H. 355, 357 (2004) ("[T]he verdict demonstrates that the jury considered each charge separately."). To the extent he argues that this evidence inflamed the jury or caused them to decide his case based upon emotion rather than reason, we, again, note that the jury acquitted the defendant of all the charged conduct that allegedly occurred three days after the alleged Fall River conduct. Cf. id. The Fall River conduct was inconsequential with respect to the evidence of guilt before the jury on witness tampering. See Papillon, 173 N.H. at 30.

Additionally, to the extent the defendant argues that the victim's fear of him or her reluctance to participate in prosecutions against him was irrelevant, the admission of the Fall River conduct tending to show the reason for her fear and reluctance was cumulative of other evidence tending to show the same. See RSA 641:5, I(b); Edic, 169 N.H. at 590-91. The jury was presented with

6

similar evidence through the victim's description of alleged events on April 22 and 23, 2017, the two letters she wrote to the New Hampshire prosecutors and her reasons for writing them, and her understanding of the defendant's text messages sent on August 16, 2018. Accordingly, we conclude that the State has met its burden of proving that any error in admitting evidence of the Fall River conduct did not affect the verdict on the witness tampering charge, and was, therefore, harmless beyond a reasonable doubt. See Papillon, 173 N.H. at 30; Edic, 169 N.H. at 592.

Arguments raised in the defendant's notice of appeal that were not briefed are considered waived. See State v. Barr, 172 N.H. 681, 694 (2019).

Affirmed.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Timothy A. Gudas,
Clerk**

Distribution:
Hillsborough County Superior Court South, 226-2018-CR-00695
Honorable Jacalyn A. Colburn
Honorable Tina L. Nadeau
Charles J. Keefe, Esquire
Elizabeth C. Woodcock, Esquire
Attorney General
Carolyn A. Koegler, Supreme Court
Lin Willis, Supreme Court
File

7